MARTIN, Circuit Judge, concurring:
In Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court "held that the Constitution 'restricts the State's power to take the life *1222 of' any intellectually disabled individual." Moore v. Texas, 581 U.S. ----, 137 S. Ct. 1039, 1048, 197 L.Ed.2d 416 (2017) (alterations adopted) (quoting Atkins, 536 U.S. at 321, 122 S. Ct. at 2252 ). But that categorical bar is not so categorical in this Circuit. No court has considered the merits of Gary Bowles's claim that he is intellectually disabled and thus exempt from the death penalty. Yet the State of Florida is set to execute him today.
I wish it were not so, but this Court's precedent constrains me to deny Mr. Bowles's application for leave to file a successive habeas petition and his request for a stay of his execution. I write separately to describe the hurdles Mr. Bowles faced at the state and federal level in his efforts to have a court review the merits of his claim of intellectual disability. For me, the hurdles Mr. Bowles has faced present unacceptable (perhaps unconstitutional) barriers to vindicating the right articulated in Atkins.
I.
Mr. Bowles was convicted of first-degree murder in 1996. After a series of proceedings in Florida state court, he was sentenced to death in 1999. On direct appeal, the Florida Supreme Court affirmed his sentence. See Bowles v. State, 804 So. 2d 1173, 1184 (Fla. 2001) (per curiam). The United States Supreme Court denied certiorari on June 17, 2002. Bowles v. Florida, 536 U.S. 930, 122 S. Ct. 2603, 153 L.Ed.2d 790 (2002). Three days later, the Supreme Court issued Atkins, which declared for the first time that the execution of intellectually disabled prisoners violates the Eighth Amendment's ban on cruel and unusual punishments. 536 U.S. at 321, 122 S. Ct. at 2252.
After Atkins, there was reason to believe Mr. Bowles's execution may be barred by this new constitutional rule. Although Mr. Bowles had not specifically been evaluated for intellectual disability before his sentencing, a clinical psychologist did test him using a then-current, full-scale intelligence assessment called the Wechsler Adult Intelligence Scale Revised (WAIS-R). Mr. Bowles got an IQ score of 80 on the WAIS-R. Accounting for errors in the methodology of the WAIS-R[1] and the standard error of measurement involved in all IQ testing, doctors gave affidavits saying this score may indicate Mr. Bowles's IQ is as low as appropriately 70. The Supreme Court observed in Atkins that an IQ of around or below 70 may reveal potential intellectual disability. See 536 U.S. at 309 n.5, 122 S. Ct. at 2245 n.5 ("[B]etween 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score" for intellectual disability). Thus, given Mr. Bowles's score on the WAIS-R and other indicators, he may well be among those whose executions are barred by Atkins.
Typically, a state prisoner in Mr. Bowles's position could raise his Atkins claim in a state postconviction motion. In the wake of Atkins, Florida gave offenders like Mr. Bowles, whose cases were in postconviction litigation, 60 days from October 1, 2004-the date Florida Rule of Criminal Procedure 3.203 was promulgated-to assert an Atkins claim. See Amendments to Fla. R. of Crim. P. & Fla. R. of Appellate P., 875 So. 2d 563, 570 (Fla. 2004). But we know from Florida's handling of those claims during the twelve years after Atkins was decided, it would have been utterly *1223 fruitless for Mr. Bowles to bring his Atkins claim in the Florida courts.
The Atkins Court left to the States the job of "developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." Id. at 317, 122 S. Ct. at 2250 (alteration adopted and quotation marks omitted). And with this discretion, Florida courts established that the State ban on executing the intellectually disabled, Fla. Stat. § 921.137, covered only those with "an IQ of 70 or below." Zack v. State, 911 So. 2d 1190, 1201 (Fla. 2005) (per curiam); see also id. (citing Cherry v. State, 781 So. 2d 1040, 1041 (Fla. 2000) (per curiam) (accepting expert testimony that an offender must score 70 or below to qualify as "[mentally] retarded")). Litigants repeatedly tested this hard cutoff in Florida's courts, saying it undermined Atkins's mandate. See, e.g., Cherry v. State, 959 So. 2d 702, 712-14 (Fla. 2007) (per curiam), abrogated by Hall v. Florida, 572 U.S. 701, 134 S. Ct. 1986, 188 L.Ed.2d 1007 (2014). But the Florida Supreme Court affirmed time and again that "a Florida defendant with an IQ score above 70 could not be deemed intellectually disabled and, therefore, was barred from presenting evidence regarding the other two prongs of the test for intellectual disability: adaptive functioning deficits and manifestation before age 18." Walls v. State, 213 So. 3d 340, 345 (Fla. 2016) (per curiam) (describing the state of the law in Florida after Atkins, but before Hall ). Under Florida's then-well-established criteria, Mr. Bowles knew his IQ score of 80 would disqualify him from relying on Atkins, no matter what other evidence he marshalled supporting a claim of intellectual disability. It made sense, therefore, for Mr. Bowles to not pursue an Atkins claim in the time limits proscribed by Florida Rule of Criminal Procedure 3.203.
Then twelve years after Atkins issued, the U.S. Supreme Court gave Mr. Bowles renewed hope about the viability of his claim of intellectual disability. In Hall v. Florida, the Supreme Court held that Fla. Stat. § 921.137, as interpreted by Florida's courts, was unconstitutional. 572 U.S. at 721, 134 S. Ct. at 2000. Florida had, according to Hall, wrongly "take[n] an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence." Id. at 712, 134 S. Ct. at 1995. Also, Florida had improperly "relie[d] on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." Id. In setting this straight, the Supreme Court said "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 723, 134 S. Ct. at 2001 (emphasis added). Surely, Hall would give Mr. Bowles a chance to press his claim that his execution might be unconstitutional. Turns out, this was not to be.
On October 19, 2017, Mr. Bowles filed a successive motion for state postconviction relief, arguing he is intellectually disabled and that his execution would violate the Eighth Amendment in light of Atkins and Hall. Around the same time, Mr. Bowles was tested using the WAIS-IV, the most widely used and current IQ assessment instrument available. He received a full-scale IQ score of 74, which falls within the range for intellectual disability. Also supporting Mr. Bowles's motion was evidence of significant deficits in adaptive functioning that had their onset during his developmental period.
Mr. Bowles's October 19, 2017 motion had been pending for 600 days when Florida's Governor signed his death warrant *1224 and scheduled his execution. Only after Mr. Bowles's execution was scheduled did the Florida Supreme Court direct Florida's lower courts to give him some indication whether he would be able to present his claim that his execution might be unconstitutional.
Tragically, in my view, the Florida courts refused to even consider the merits of Mr. Bowles's claim. Instead, the circuit court summarily denied Mr. Bowles's claim as time-barred, and the Florida Supreme Court affirmed this decision. See Bowles v. State, --- So. 3d ----, ---- - ----, 2019 WL 3789971, at *2-3 (Aug. 13, 2019). The Florida Supreme Court explained that Mr. Bowles could not present his potentially viable Atkins claim because he failed to present it within 60 days of Florida Rule of Criminal Procedure 3.203 being promulgated. Id. at ----, 2019 WL 3789971 at *2 (citing Harvey v. State, 260 So. 3d 906, 907 (Fla. 2018) ; Rodriguez v. State, 250 So. 3d 616 (Fla. 2016) ). This time restriction applies, the Court held, even though Mr. Bowles did not have a meritorious claim until (at the earliest) Hall held Florida's rigid IQ cutoff unconstitutional. See Bowles, --- So.3d at ---- - ----, 2019 WL 3789971, at *2-3. The Court also imposed the time limit even though it had ruled that Hall is retroactively applicable to Florida litigants. See Walls v. State, 213 So. 3d at 346-47 ; see also Harvey, 260 So. 3d at 907.
I believe Florida's time bar "creates an unacceptable risk that persons with intellectual disability will be executed." Hall, 572 U.S. at 704, 134 S. Ct. at 1990. For more than a decade after Atkins, Florida law denied every offender who scored above 70 on an IQ test any exploration of the merits of a claim of intellectual disability. It wasn't until Hall was decided that Mr. Bowles could get the benefit of Atkins's pronouncement. Nevertheless, the Florida courts say Mr. Bowles's failure to press a claim that would have been deemed frivolous means he forever gave up any chance to present evidence of his potential intellectual disability. This rule dilutes Atkins's constitutional mandate for Florida death row inmates.
Hall requires that "[p]ersons facing that most severe sanction [of the death penalty] must have a fair opportunity to show that the Constitution prohibits their execution." Id. at 724, 134 S. Ct. at 2001 (emphasis added). Although the Supreme Court acknowledged "the States play a critical role in advancing protections and providing the Court with information that contributes to an understanding of how intellectual disability should be measured and assessed," " Atkins did not give the States unfettered discretion to define the full scope of the constitutional protection." Id. at 719, 134 S. Ct. at 1998. Neither did Atkins afford States the liberty to construct procedural rules that gut the constitutional requirement. See In re Hill, 715 F.3d 284, 304-05 (11th Cir. 2013) (Barkett, J., dissenting) (arguing no "procedural hurdle ... can be constitutionally enforced when doing so will eviscerate the constitutionally-protected right that a juvenile, mentally retarded, or insane offender has not to be executed."); Hill v. Humphrey, 662 F.3d 1335, 1367-70 (11th Cir. 2011) (en banc) (Barkett, J., dissenting) (describing Supreme Court precedent establishing that "a State cannot create procedures that effectively eviscerate a substantive constitutional right, but rather must provide procedures which are adequate to safeguard against infringement of the constitutionally protected right" (alteration adopted and quotation marks omitted)); cf. Chapman v. California, 386 U.S. 18, 21, 87 S. Ct. 824, 826, 17 L.Ed.2d 705 (1967) ("With faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people *1225 from infractions by the States of federally guaranteed rights."). The Florida courts designed a rule that has denied Mr. Bowles any meaningful opportunity to have his claim considered on the merits. Because neither Mr. Bowles nor his counsel predicted a change in the law or anticipated that he would need to pursue a then-frivolous claim, the Florida courts say he must forgo the protections afforded to him by Atkins and Hall.
"[T]o impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being." Hall, 572 U.S. at 708, 134 S. Ct. at 1992. We cannot pretend to avoid this violation simply by failing to learn whether an offender is intellectually disabled. "The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects." Id. at 724, 134 S. Ct. at 2001. The Florida courts may have done exactly that. Mr. Bowles should have been permitted to develop the record supporting his claim of intellectual disability. Now, we will never know whether his execution defies Atkins's categorical mandate.
II.
When the Florida courts refused all evaluation of the merits of Mr. Bowles's claim of intellectual disability, he next looked to the federal courts to consider his claim. Yet, because of the strictures of the Antiterrorism and Effective Death Penalty Act of 1996 (AEPDA) and precedent in this Circuit, he finds no audience for the merits of his claim here either.
Mr. Bowles seeks to file a successive federal habeas corpus petition under 28 U.S.C. § 2254. It is successive because he already filed one § 2254 petition raising claims that are not at issue here. This being the case, he must meet the requirements of 28 U.S.C. § 2244(b) before filing a second federal petition. Under AEPDA, this court may not grant authorization to file a successive habeas petition unless an applicant satisfies one of two narrow statutory exceptions in § 2244(b)(2) :
(A) [T]he applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
Under this Circuit's precedent, Mr. Bowles can meet neither exception.
Use of the first exception is foreclosed by In re Henry, 757 F.3d 1151 (11th Cir. 2014), which held that the Supreme Court did not make the new rule announced in Hall retroactive to cases on collateral review. Id. at 1159. I dissented from Henry's holding, explaining my view that "if Atkins is retroactively applicable to cases on collateral review-and that conclusion is beyond any debate-then the Supreme Court's decision in Hall must also apply retroactively, to the extent it merely represents an application or clarification of the Atkins decision." Id. at 1165 (Martin, J., dissenting). I continue to believe Henry was wrongly decided.
The Majority Opinion also says Mr. Bowles cannot make a prima facie showing under § 2244(b)(2)(A) based on his argument that his Atkins claim was "previously unavailable" until Hall issued. To make a prima facie showing, a petitioner need only *1226 make "a sufficient showing of possible merit to warrant a fuller exploration by the district court." In re Holladay, 331 F.3d 1169, 1173-74 (11th Cir. 2003) (quotation marks omitted). Absent the strictures of our precedent, I would hold that Mr. Bowles has made a prima facie showing under § 2244(b)(2)(A).
The Fifth Circuit recognized a prima facie case for an inmate who had been afforded a path to relief, yet that path offered no actual possibility of relief. See In re Cathey, 857 F.3d 221 (5th Cir. 2017) (per curiam). It found that a Texas petitioner "presented sufficiently 'cogent arguments' that Atkins was previously unavailable" because at the time he filed his first federal habeas petition he "believed his IQ score to be 77-outside of the range that was then understood to satisfy the subaverage intellectual functioning prong of an Atkins claim." Id. at 230. Like Florida, Texas courts then used a cutoff for IQ scores, so the petitioner "had no reason to believe his known score of 77 ... would satisfy an Atkins claim." Id. The Fifth Circuit recognized the petitioner's claim was practically unavailable even if he technically could have asserted it. See id. at 232-34. The Court permitted him to file his successive habeas petition because he made a prima facie showing that Atkins was previously unavailable to him. Our Court has not recognized such an exception. However, we could have, and I would have done so here.
As for Mr. Bowles's reliance on the second exception, his argument is foreclosed by In re Hill. Hill is another decision of this Court I believe was wrongly decided. Hill established that the exception in § 2244(b)(2)(B) concerning newly discovered evidence "is a narrow exception for claims that call into question the accuracy of a guilty verdict" and not Atkins claims that go to a prisoner's eligibility for the death penalty. Hill, 715 F.3d at 296-97 (alterations adopted and emphasis and quotation marks omitted). The Hill panel said that the exception for newly discovered evidence "does not authorize the filing of a successive application under § 2244(b)(2)(B) based on a sentencing claim even in death cases." Hill, 715 F.3d at 297. Hill also rejected the idea that equitable exceptions to the bar on successive petitions that existed before AEDPA survived the enactment of AEDPA. See id. at 299-301. I believe this Court should have recognized that we may authorize petitioners to file a successive application for federal habeas relief raising an innocent-of-the-death-penalty claim. Either § 2244(b)(2)(B) or equitable exceptions to AEDPA's filing limitations would, in my view, allow for consideration of these claims in death penalty cases.
Before AEDPA became law, the Supreme Court recognized that in a "narrow class of cases," "[f]ederal courts retain the authority to issue the writ of habeas corpus" despite a petitioner's procedural default and "despite a petitioner's failure to show cause for a procedural default." McCleskey v. Zant, 499 U.S. 467, 494, 111 S. Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). "This rule, or fundamental miscarriage of justice exception, [wa]s grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." Herrera v. Collins, 506 U.S. 390, 404, 113 S. Ct. 853, 862, 122 L.Ed.2d 203 (1993) (quotation marks omitted). To prove a miscarriage of justice, a petitioner had to make a "colorable showing" of actual innocence. Id.
In Sawyer v. Whitley, 505 U.S. 333, 112 S. Ct. 2514, 120 L.Ed.2d 269 (1992), the Supreme Court held that the "actual innocence" exception applied to claims asserting innocence of the facts required to show the petitioner's eligibility for the death *1227 penalty. Id. at 346-47, 112 S. Ct. at 2522-23. To bring a claim of actual innocence of the death penalty, a petitioner had to present evidence establishing "a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law for the imposition of the death penalty." Id. at 346, 112 S. Ct. at 2523 (quotation marks omitted).
Circuits have divided over whether Sawyer's actual innocence exception survived the passage of AEDPA. In Hill, a divided panel of this Court said the Sawyer exception did not survive. 715 F.3d at 299-300. The Hill panel reasoned that Congress could have, but did not, expressly codify the Sawyer exception in AEDPA. Id. at 300. For that reason, it said Congress did not intend the Sawyer exception to remain viable. See id. At least one other circuit has agreed. Hope v. United States, 108 F.3d 119, 119-20 (7th Cir. 1997). But this Court's holding in Hill contrasts with decisions of the Fourth, Sixth, and Ninth Circuits. See Prieto v. Zook, 791 F.3d 465, 469 (4th Cir. 2015) ; Frazier v. Jenkins, 770 F.3d 485, 497 (6th Cir. 2014) ; Thompson v. Calderon, 151 F.3d 918, 924 (9th Cir. 1998) (en banc). I find the rulings of those circuits to express the better view. Cf. In re Holsey, 589 F. App'x 462, 466 (11th Cir. 2014) (Martin, J.) (unpublished) (noting "compelling arguments that Sawyer's 'innocence of the death penalty' exception should survive § 2244(b)'s restrictions").
In contrast to this Circuit, those courts recognized that the passage of AEDPA did not mean Congress intended for courts to wholly abandon all equitable habeas doctrines. As the Supreme Court explained in Holland v. Florida, 560 U.S. 631, 130 S. Ct. 2549, 177 L.Ed.2d 130 (2010), "AEDPA seeks to eliminate delays in federal habeas review" but it "seeks to do so without undermining basic habeas corpus principles and while seeking to harmonize the new statute with prior law," including "equitable principles." Id. at 648, 130 S. Ct. at 2562. Although "Congress codified new rules governing this previously judicially managed area of law, it did so without losing sight of the fact that the writ of habeas corpus plays a vital role in protecting constitutional rights." Id. at 649, 130 S. Ct. at 2562 (quotation marks omitted). The Supreme Court thus cautioned that "[t]he importance of the Great Writ, the only writ explicitly protected by the Constitution, Art. I, § 9, cl. 2, along with congressional efforts to harmonize the new statute with prior law, counsels hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open." Id.
This Court's decision in Hill did not heed Holland's warning. Instead, Hill relied almost exclusively on congressional silence to foreclose equitable claims. This is the very thing Holland told us not to do. Neither did the Hill panel seek to harmonize AEDPA's restrictions with existing equitable doctrines, as it was required to do. These errors produced what I view as an inherently flawed decision and an equally flawed conclusion that AEDPA eliminated the Sawyer exception.
The Majority Opinion is right when it notes that Holland did not expressly address the application of the Sawyer exception after the passage of AEDPA. I rely on it here not for that proposition, but for the idea that AEDPA did not wipe away the existing equitable doctrines related to the writ of habeas corpus.
I note, too, the Hill panel failed to appreciate that the language of § 2244(b)(2)(B) does not compel an interpretation as narrow as the one this Court assigned it. See Thompson, 151 F.3d at 924. As the Ninth Circuit explained, "the *1228 words 'underlying offense' [in § 2244(b)(2)(B)(ii) ] encompass a charge of capital murder." Thompson, 151 F.3d at 924. "[T]he difference in the language between the Sawyer standard and ... § 2244(b)(2)(B)(ii)" was not intended to obliterate the Sawyer exception. Thompson, 151 F.3d at 924. Instead, it "was to accommodate non-capital as well as capital habeas petitions." Id. Again, the Ninth Circuit offers a more sound interpretation of § 2244(b)(2)(B). It harmonizes AEDPA with preexisting equitable doctrines, as the Supreme Court instructed us to do. See Holland, 560 U.S. at 649, 130 S. Ct. at 2562. It is this Court's flawed precedent that stands in the way of any merits review of Mr. Bowles's intellectual disability claim. Cases like Mr. Bowles's demonstrate the need for the Supreme Court or this Court sitting en banc to revisit the decisions that deny Bowles and others like him any chance to have their constitutional claims reviewed.
III.
The time bar imposed by the Florida courts and this Court's interpretation of the requirements of AEDPA mean that Florida will end Mr. Bowles's life without ever knowing whether his execution violates the Eighth Amendment. I am bound by the law of this Circuit to concur in the denial of his application for leave to file a successive habeas petition. But I do not consider this decision to be a just one.

According to doctors' affidavits, the WAIS-R was not properly normed and thus overstates IQ in certain populations.