[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No.  19-13149-P
_____

In re: GARY RAY BOWLES,

Petitioner.

_____

Application for Leave to File a Second or Successive
Habeas Corpus Petition, 28 U.S.C. § 2244(b)
_____

Before: ED CARNES, Chief Judge, TJOFLAT, and MARTIN, Circuit Judges.

ED CARNES, Chief Judge:

Proceeding under 28 U.S.C. § 2244(b)(3)(A), Gary Ray Bowles has filed an application seeking an order authorizing the district court to consider a second or successive petition for a writ of habeas corpus.  Because he is scheduled to be executed by the State of Florida on August 22, 2019, at 6:00 p.m., he has also filed an emergency motion to stay his execution so that he can pursue his second or successive habeas petition.  We deny those requests.

## I.  PROCEDURAL HISTORY

We have set out the facts of Bowles' crimes in our order denying his motion for a stay of execution based on his §1983 claim.  See Bowles v. DeSantis, No. 19-12929-P, -- F.3d --, 2019 WL 3886503, at *1–3 (11th Cir. Aug. 19, 2019).

### A.  Sentencing, Re-Sentencing, And Bowles' Direct Appeals

In November of 1994 Bowles murdered Walter Hinton by dropping a 40-pound concrete block on his head while Hinton was sleeping.  Bowles v. State, 716 So. 2d 769, 770 (Fla. 1998) (per curiam).  Bowles pleaded guilty to the crime and was sentenced to death.  Id.  The Florida Supreme Court affirmed the conviction but vacated the death sentence because of an evidentiary error at the original sentence proceeding.  Id. at 773.  On remand, a jury unanimously recommended death and the trial court again imposed that sentence.  Bowles v. State, 804 So. 2d 1173, 1175 (Fla. 2001) (per curiam).  This time the Florida Supreme Court affirmed the sentence.  Id. at 1184.  The United States Supreme Court denied certiorari on June 17, 2002, and Bowles' conviction and death sentence became final.  See Bowles v. Florida, 536 U.S. 930 (2002) (mem.).

### B.  First State Postconviction Motion

Following the conclusion of his direct appeals, Bowles sought relief in state postconviction proceedings under Rule 3.851 of the Florida Rules of Criminal Procedure.  See Bowles v. State, 979 So. 2d 182, 184 (Fla. 2008) (per curiam).  He

2

filed his first collateral motion on August 29, 2003, asserting claims of ineffective assistance of counsel, improper jury instructions, and the unconstitutionality of Florida's death penalty scheme. Id. at 186 & n.2. In one of the claims he said that his trial counsel were ineffective because they failed to present an expert witness at his sentence hearing to discuss various mitigating factors related to his mental health. See id. at 186–87. He admitted that his counsel had retained a psychologist, Dr. Elizabeth McMahon, to evaluate him, but argued that the lawyers were ineffective because they did not have her testify. Id. at 187.

The postconviction trial court held an evidentiary hearing and admitted the deposition testimony of Dr. McMahon. Id. She stated that Bowles was "probably not working with what we would say is an intact brain" and that he had "some very mild dysfunction." Id. But she also said that Bowles had told her of three additional murders he had committed. Id. She explained that Bowles' trial counsel made the strategic decision not to have her testify so that she would not be asked about those additional murders on cross-examination. Id. The postconviction court denied Bowles' motion, and the Florida Supreme Court affirmed. Id. at 187–89, 94.

C. First Federal Habeas Petition

Bowles filed his first petition for habeas corpus relief under 28 U.S.C. § 2254 in federal district court on August 8, 2008. See Petition, Bowles v. Sec'y,

3

Dep't of Corr, 3:08-cv-791 (M.D. Fla. Aug. 8, 2008), ECF No. 1.  He raised ten

grounds for relief.  Id.  None of them contained an intellectual disability claim.

The district court denied the petition but granted Bowles a certificate of

appealability on one issue based on the State's use of peremptory challenges at the

resentencing trial.  See Order, Bowles v. Sec'y, Dep't of Corr, 3:08-cv-791 (M.D.

Fla. Dec. 23, 2009), ECF No. 18.  This Court affirmed the district court's denial of

relief, see Bowles v. Sec'y, Dep't of Corr, 608 F.3d 1313, 1317 (11th Cir. 2010),

and the United States Supreme Court denied Bowles' petition for a writ of

certiorari, see Bowles v. McNeil, 562 U.S. 1068 (2010) (mem).

### D.  Second and Third State Postconviction Motions

In March 2013 Bowles brought a successive Rule 3.851 postconviction

motion in Florida state court, raising two claims of ineffective assistance of

appellate counsel based on the Supreme Court's decision in Martinez v. Ryan, 566

U.S. 1 (2012).  The postconviction trial court denied that motion in July 2013 and

Bowles did not appeal.  See Order Denying Defendant's Successive Motion to

Vacate Judgment of Conviction and Sentence, State v. Bowles, No. 16-1994-CF-

012188-AXXX-MA, (Fla. 4th Cir. Ct. Jul. 17, 2013), Doc. D1573.

About four years later, on June 14, 2017, Bowles filed another successive

motion for postconviction relief in Florida state court.  This one was based on the

Supreme Court's decision in Hurst v. Florida, 136 S. Ct. 616 (2016).  The state

4

trial court denied that motion and the Florida Supreme Court affirmed.  See

Bowles v. State, 235 So. 3d 292, 292–93 (Fla. 2018), cert. denied, Bowles v.

Florida, 139 S. Ct. 157 (2018) (mem).

### E.  Fourth State Postconviction Motion

Bowles filed his fourth motion for postconviction relief in Florida state court

on October 19, 2017.  That motion raised a single claim of intellectual disability

based on the Supreme Court's decisions in Moore v. Texas, 137 S. Ct. 1039

(2017), Hall v. Florida, 572 U.S. 701 (2014), and Atkins v. Virginia, 536 U.S. 304

(2002).  Bowles amended his intellectual disability claim on July 1, 2019, which

was after the Governor had denied his clemency application and had set an

execution date for August 22, a little more than seven weeks later.  In his amended

motion Bowles asserted that he "is now, and has always been, an intellectually

disabled person."  As a result, he claimed, his death sentence must be vacated

because the Supreme Court in Atkins had created a "categorical rule" making

intellectually disabled offenders "ineligible for the death penalty."

The Florida postconviction trial court summarily denied the motion as

untimely and the Florida Supreme Court affirmed.  See Bowles v. State, Nos.

SC19-1184 & SC19-1264, 2019 WL 3789971, at *1–3 (Fla. Aug. 13, 2019).  The

Florida Supreme Court also denied Bowles' habeas petition claiming that the death

penalty is cruel and unusual punishment barred by the Eighth Amendment of the

5

United States Constitution.  Id. at *4.  Bowles filed a petition for a writ of certiorari in the United States Supreme Court and asked that Court for a stay of execution. See Bowles v. State, Nos. 19-5617 & 19A183 (U.S. Aug. 16, 2019).

### F.  Second Federal § 2254 Petition And Motion To Stay

On August 14, 2019, Bowles filed his second 28 U.S.C. § 2254 petition in federal district court, raising a claim of intellectual disability for the first time in a federal postconviction proceeding.  He also filed a motion for a stay of execution. The district court dismissed the petition for lack of subject matter jurisdiction and denied the motion for a stay as moot.  The court concluded that because Bowles had already filed a § 2254 petition in 2008 he could not file another one without first obtaining this Court's authorization, which he had not done.  Bowles appealed the district court's dismissal in a separate action before this Court.  See Notice of Appeal, Bowles v. Sec'y, Fla. Dep't of Corr., No. 19-13150-P (11th Cir. Aug. 19, 2019).

### II.  DISCUSSION

Bowles asks us for authorization to file a second or successive habeas petition so that he can bring a claim that he is intellectually disabled and thus ineligible for the death penalty.  He asserts that he has taken two full-scale intelligence tests, and they show that his intelligence is well below average.  On

6

the first, which was administered in 1995, he received a score of 80.[1]  On the

second, which was administered in 2017, he received a score of 74.  He also

presents affidavits from various psychologists who have determined that "it is

likely" that he is intellectually disabled.  And he includes the written observations

of lay witnesses who knew him when he was young; those witnesses said that

Bowles was forgetful and aimless and showed signs of intellectual disability.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),

we may authorize the filing of a second or successive § 2254 petition only if the

applicant makes a "prima facie showing" that: (1) his claim "relies on a new rule of

constitutional law, made retroactive to cases on collateral review by the Supreme

Court, that was previously unavailable," or (2) "the factual predicate for the claim

---

[1]  Our concurring colleague addresses the merits of Bowles' claims and accepts his assertions that he has provided "evidence of significant deficits in adaptive functioning that had their onset during his developmental period" and that his IQ score of 80 could be "as low as appro[ximately] 70" if lowered for the standard error of measurement and if "properly normed," which is to say if lowered even further for what is called the Flynn effect.  For the reasons explained later in this opinion, see infra at 14, we do not consider the merits of Bowles' claim at this time.

We will, however, note that these assertions and the affidavits tendered in support of them are not uncontested.  The State has presented evidence that Bowles does not have significant deficits in adaptive functioning, and that he was not intellectually disabled as a minor.  For example, Bowles has obtained his GED diploma while incarcerated, and his grades in the early years of elementary school were standard.  And the Flynn effect that Bowles relies on, which "adjusts for the empirical observation that IQ scores are rising over time," is not "required in this Circuit" because "there is no consensus about the Flynn effect among experts or among the courts."  See Raulerson v. Warden, 928 F.3d 987, 1008 (11th Cir. 2019).

could not have been discovered previously through the exercise of due diligence; and the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2), (b)(3)(C).

Neither of those routes is open to Bowles.  As to the first, he does not rely "on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," § 2244(b)(2)(A), because all the cases he relies on were either previously available to him or were not made retroactive to cases on collateral review.

The first and primary Supreme Court case Bowles relies on is <u>Atkins</u>, 536 U.S. 304.  That case did announce a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review within the meaning of § 2244(b)(2)(A).  <u>In re Holladay</u>, 331 F.3d 1169, 1172–73 (11th Cir. 2003).  But the Supreme Court announced that rule in 2002, which was six years before Bowles filed his first federal habeas petition.  See <u>Atkins</u>, 536 U.S. at 304.  That means that the decision was not "previously unavailable" to him because he could have included it in his original habeas petition.  See <u>In re Everett</u>, 797 F.3d 1282, 1291–92 (11th Cir. 2015) (noting that petitioner could not rely on Supreme Court decision that was decided years before his habeas petition as a "rule of law that

was previously unavailable, as required by the statute"); In re Hill, 113 F.3d 181, 182–83 (11th Cir. 1997) ("In general, we have interpreted the term 'previously unavailable' with reference to the availability of the claim at the time the first federal habeas application was filed.").  It also means that Bowles cannot now rely on Atkins as a "new" rule of constitutional law.  At 17 years old the rule is no longer new.  See In re Hill, 437 F.3d 1080, 1083 (11th Cir. 2006) (denying Atkins-based second or successive application because it was filed more than a year after the Supreme Court decided Atkins).

Bowles tries to get around those barriers by arguing that Atkins was not actually "available" to him when he filed his first habeas petition in 2008 because then-existing Florida law would have doomed his petition.  His argument goes like this.  In Atkins the Supreme Court held that the Eighth Amendment prohibits the execution of intellectually disabled offenders, but the Court left to the states the task of developing the processes for determining which offenders are intellectually disabled.  536 U.S. at 317.  And under post-Atkins Florida law for an inmate to qualify as intellectually disabled he must have had an IQ score that was two or more standard deviations below the mean score on a standard intelligence test.  See Hall 572 U.S. at 711.  The Florida Supreme Court interpreted that law to create a hard cutoff at two deviations below the mean, meaning an IQ score of 70 or below. See id. at 721.  Bowles argues that it would have been useless for him to bring his

9

intellectual disability claim in his first habeas petition because his IQ score of 74 (as measured by the test he took in 2017) would not have qualified under Florida law at the time.

Bowles asserts that Atkins first became available to him in 2014 when the Supreme Court struck down Florida's rigid cutoff as unconstitutional in Hall v. Florida, 572 U.S. 704 (2014). In Hall the Court explained that Florida's hard cutoff did not account for the IQ test's standard error of measurement of plus or minus 5 points, which meant that an inmate who scored between 70 and 75 on the test might actually have a true IQ of 70 or below. Id. at 722–23. The Court also relied heavily on the latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which was published in 2013, to hold that "an individual with an IQ test score between 70 and 75 or lower may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." Id. at 722. Bowles insists that "[i]t was not until Hall that Florida was forced to adapt to current medical standards," and that change made his "IQ score [of 74] qualifying, thus making an intellectual disability claim viable for the first time."

For that argument Bowles also points us to two Fifth Circuit decisions in which that court granted second or successive applications based on Atkins claims that were not raised in initial habeas petitions which were filed, or could have been

10

timely amended, after the Supreme Court decided Atkins.  See In re Johnson, No. 19-20552, -- F.3d --, 2019 WL 3814384 (5th Cir. Aug. 15, 2019); In re Cathey, 857 F.3d 221, 229 (5th Cir. 2017).  In those cases the Fifth Circuit determined that it would not have been "feasible" for the petitioners to have raised timely Atkins claims because the claims would have been found meritless under the state's rigid IQ cutoff that existed at the time.  See In re Johnson, 2019 WL 3814384, at *5; In re Cathey, 857 F.3d at 229.  As the In re Cathey court stated: "We think a claim must have some possibility of merit to be considered available."  857 F.3d at 232.  "[W]e are not bound by the decisions of our sister circuits."  OSI, Inc. v. United States, 285 F.3d 947, 952 n.3 (11th Cir. 2002).  Those decisions are not retroactively applicable decisions of the Supreme Court, which is what the AEDPA requires.  § 2244(b)(2)(A).

To the extent that Bowles argues that his Atkins claim was not previously available to him because it lacked merit under case law existing at that time, we reject that contention.  There is no futility exception to the AEDPA's restrictions on second and successive petitions.[2]

---

[2]  There is also no futility exception that explains why Bowles could not have timely raised his Atkins claim in Florida state court.  The concurring opinion faults the Florida Supreme Court's denial of Bowles' intellectual disability claim as untimely because, the opinion says, Bowles should not be penalized for "fail[ing] to press a claim that would have been deemed frivolous" after Atkins.  It asserts that we know the Florida courts would have deemed such a claim frivolous because of how those courts handled Atkins claims "during the twelve years after Atkins was decided."  But when Florida promulgated Rule of Criminal Procedure 3.203 and gave inmates like Bowles until October 1, 2004 to bring an Atkins claim, the future was not known.

Under § 2244(b)(2)(A), an applicant seeking authorization to file a second or successive habeas petition must show "that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." See Tyler v. Cain, 533 U.S. 656, 662 (2001). Congress did not say that the claim could proceed if it relied on any other type of change in case law. Congress knew how to say that if it had wanted to.

---

Bowles could not tell how the Florida courts would handle his claim because he did not know then what the next "twelve years" might hold. There is no reason Bowles could not have amended his state postconviction motion to add an Atkins claim during the time frame specified in Florida's Rules of Criminal Procedure.

The concurring opinion also faults the Florida Supreme Court for denying Bowles' postconviction motion as untimely because, the opinion asserts, he should have been allowed to rely on the United States Supreme Court's decision in Hall, which the Florida Supreme Court later made retroactive to certain Florida inmates in Walls v. State, 213 So. 3d 340, 345 (Fla. 2016) (per curiam). But again, there is no reason that Bowles could not have made the same arguments that Hall or Walls made. Under the concurring opinion's logic, those inmates also did not have meritorious claims. If such a claim by Bowles would have been frivolous, their claims would also have been frivolous in the concurring opinion's view. But Hall and Walls brought the claims anyway, and they won. Why couldn't Bowles? He could have and should have brought the same claim. Cf. Smith v. Murray, 477 U.S. 527, 535 (1986) ("[I]t is the very prospect that a state court 'may decide, upon reflection, that the contention is valid' that undergirds the established rule that 'perceived futility alone cannot constitute cause.") (citation and quotation marks omitted); Engle v. Isaac, 456 U.S. 107, 130 (1982) ("If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid.") (footnote omitted); Turner v. Crosby, 339 F.3d 1247, 1281 (11th Cir. 2003) ("Although Ring was decided several years subsequent to the termination of Turner's state post-conviction proceedings, he was free, prior to Ring, to make a federal constitutional challenge to Florida's capital sentencing structure in the state courts but failed to do so."); Waldrop v. Jones, 77 F.3d 1308, 1315 (11th Cir. 1996) ("According to the Supreme Court, the 'futility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial.'") (quoting Engle, 456 U.S. at 130).

12

Likewise, Congress knew how to provide for second and successive petitions based on factual developments, such as the publication of a new DSM manual. In § 2244(b)(2)(B),  Congress allowed a second or successive petition to proceed if "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and the facts underlying the claim "would be sufficient to establish . . . that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." (Emphasis added).  It could have said  "or ineligible for the death penalty," but it did not.  "It is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Ela v. Destefano, 869 F.3d 1198, 1202 (11th Cir. 2017) (quotation marks omitted).  Bowles reads into the statute words that are not there when he argues that the publication of a new diagnostic manual can serve as a predicate to make a claim newly available under § 2244(b)(2)(A).  That's not the statute Congress wrote.

Instead, under the statute Congress enacted, whether a claim is "previously unavailable" depends on when a "new rule of constitutional law" is made retroactive by the Supreme Court, because it is that new rule that the claim must rely on.  See In re Thomas, 823 F.3d 1345, 1349 (11th Cir. 2016) (denying

13

application for leave to file a second or successive habeas petition based on Descamps v. United States, 570 U.S. 254 (2013), because Descamps did not announce a new rule of constitutional law). That a claim has become meritorious for some other reason has no bearing on whether the claim was "previously unavailable" for § 2244(b)(2)(A) purposes. When considering a second or successive application, we are not making an ultimate determination on the merits, so we do not search for outside factual predicates that may have made a claim meritorious. See In re Moss, 703 F.3d 1301, 1303 (11th Cir. 2013). That is simply not part of our analysis.

This is a flaw in Bowles' application, which equates the word "cognizable" with the word "meritorious." Those words do not mean the same thing. Compare Cognizable, Black's Law Dictionary (11th ed. 2019) ("Capable of being judicially tried or examined before a designated tribunal; within the court's jurisdiction . . . ."), and Cognizable, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/cognizable (last visited Aug. 22, 2019) ("[C]apable of being judicially heard and determined[.]"), with Meritorious, Black's Law Dictionary (11th ed. 2019) ("(Of a case, etc.) worthy of legal victory; having enough legal value to prevail in a dispute . . . ."), and Meritorious, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/meritorious (last visited Aug. 22, 2019) ("[H]aving merit

14

. . . a meritorious claim[.]").  We choose instead to follow the terms of the statute, which requires that we look to see: (1) whether the claim relies on a new rule of constitutional law that was made retroactive to cases on collateral review by the Supreme Court, and (2) whether the petitioner could have relied on that "new rule" in his initial habeas petition.  If he could have, then that claim was previously available to him and his application must be denied.  See, e.g., In re Henry, 757 F.3d 1151, 1158 n.10 (11th Cir. 2014) (stating that prisoner could not rely on the rule from Atkins to support a second or successive habeas petition because that rule was not "previously unavailable" to him, where the prisoner filed his first habeas petition two years after Atkins was decided); Felker v. Turpin, 83 F.3d 1303, 1306 (11th Cir. 1996) ("[W]e cannot find that [the prisoner's] Cage claim was 'previously unavailable' to him when he filed his first habeas petition in 1993, which was long after Cage was decided.").  Bowles filed his first federal habeas petition six years after the Atkins decision.

For the same reason, our feasibility analysis does not focus on whether the claim would have been a winning one at the time of the first petition, but on whether it would have been feasible for the petitioner to bring the claim then.  See In re Everett, 797 F.3d at 1288 (noting that "[i]f the new rule was announced while the original § 2254 petition was pending, the applicant must demonstrate that it was not feasible to amend his or her pending petition to include the new claim"); In

15

re Hill, 113 F.3d at 183 ("[O]ur precedent establishes that a petitioner intent upon establishing the 'unavailability' of a claim based upon a new rule of constitutional law may also be required to demonstrate the infeasibility of amending a habeas petition that was pending when the new rule was announced.").  The existence of a "new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court," depends solely on Supreme Court decisions, not on the issuance of a new diagnostic manual by the American Psychiatric Association or on a decision of a sister circuit.

In any event, the more fundamental problem with Bowles' argument is that it does not rely on Atkins so much as it does on Hall.  Despite what he calls it, his claim actually is a Hall claim, not an Atkins claim.  See Shoop v. Hill, 139 S. Ct. 504, 508 (2019) ("While Atkins noted that standard definitions of mental retardation included as a necessary element 'significant limitations in adaptive skills . . . that became manifest before age 18,' Atkins did not definitively resolve how that element was to be evaluated but instead left its application in the first instance to the States.") (quoting Atkins, 535 U.S. at 318).  Hall did announce a new rule of constitutional law, but the Supreme Court has not made that new rule retroactive to cases on collateral review.  In re Henry, 757 F.3d at 1159 (denying petitioner leave "to file a second or successive petition because the Supreme Court has not made the new rule announced in Hall retroactive to cases on collateral

16

review"); see In re Hill, 777 F.3d 1214, 1223 (11th Cir. 2015) ("[O]ur binding

panel precedent, In re Henry, forecloses [the petitioner's] argument that Hall

applies retroactively on collateral review and entitles him to file a second or

successive habeas petition."); Kilgore v. Sec'y, Fla. Dep't of Corr., 805 F.3d 1301,

1314–15 (11th Cir. 2015) (holding in initial habeas appeal that Hall did not create a

new rule of constitutional law that was made retroactive under Teague v. Lane, 489

U.S. 288 (1989)).[3]  As a result, Bowles cannot now bring a Hall claim, even one

that is dressed up to look like an Atkins claim.

---

[3] We recently noted in dicta that the Supreme Court's reasoning in Montgomery v. Louisiana, 136 S. Ct. 718 (2016), "undermined the reasoning of Kilgore and In re Henry." Smith v. Comm'r, Ala. Dep't of Corr., 924 F.3d 1330, 1339 n.5 (11th Cir. 2019).  We had said in In re Henry that a new Supreme Court rule "guarantee[ing] only a chance to present evidence, not ultimate relief," is necessarily a non-retroactive procedural rule under Teague.  757 F.3d at 1161. But in Montgomery the Supreme Court "deemed a rule substantive in nature — the rule of Miller v. Alabama, 567 U.S. 460 (2012), which prohibited mandatory life without parole sentences for juveniles — even though all that rule guaranteed was '[a] hearing where youth and its attendant characteristics are considered as sentencing factors,' not a shorter sentence or parole." Smith, 924 F.3d at 1339 (quoting Montgomery, 136 S. Ct. at 735) (quotation marks omitted).  Given the Supreme Court's reasoning in Montgomery, in Smith we were cautious not to base our decision solely on our earlier reasoning in Kilgore and In re Henry to determine whether the Supreme Court's decision in Moore v. Texas, 137 S. Ct. 1038 (2017), applied retroactively.  See 924 F.3d at 1339 n.5.

Our statements in Smith do not help Bowles because our holdings in In re Henry and Kilgore remain binding precedents in this Circuit.  "While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point."  Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1292 (11th Cir. 2003).  The Supreme Court's decision in Montgomery was not "clearly on point" as to the retroactivity of its decision in Hall.  And, in any event, our reasoning in In re Henry and Kilgore did not rely only on the rule that was called into question by Montgomery anyway.  Instead, those decisions relied on the fact that Hall does not expand the class of people (the intellectually disabled) who are entitled to relief under Atkins.  See In re Henry, 757 F.3d at 1161.  By contrast, the Supreme Court in Montgomery determined that Miller announced a substantive rule because it forbade the states from imposing a certain penalty on an entire class of offenders: juveniles whose crimes do not reflect permanent incorrigibility.  See Montgomery, 136 S. Ct. at 734.

17

Not only that, but even if <u>Hall</u> did apply retroactively, Bowles' claim would not be timely anyway.  The Supreme Court decided <u>Hall</u> on May 27, 2014, meaning that under § 2244(d)(1)(C) Bowles would have had one year from then to file his <u>Hall</u>-based claim.  But he did not file his § 2254 petition until August 14, 2019, more than five years later.  And he did not even file his state postconviction motion until October 19, 2017, more than three years after <u>Hall</u> was decided.  Because of his delay, his claim has ended up in this Court three and a half days before his execution is scheduled to take place.  See <u>In re Hill</u>, 437 F.3d at 1083 (denying <u>Atkins</u>-based second or successive application because it was filed more than a year after the Supreme Court decided <u>Atkins</u>); <u>see also</u> <u>In re Jackson</u>, 826 F.3d 1343, 1350 n.8 (11th Cir. 2016) (noting that "[a]n imminent execution" constitutes a valid reason to consider the untimeliness of a claim in a second or successive application).

Bowles also relies on <u>Moore v. Texas</u>, 137 S. Ct. 1038 (2017), but we have held that <u>Moore</u> "cannot be applied retroactively," either.  <u>Smith v. Comm'r, Ala. Dep't of Corr</u>, 924 F.3d 1330, 1338–39 (11th Cir. 2019).  As a result, Bowles has not shown that his claim "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  § 2244(b)(2)(A).

18

That leaves § 2244(b)(2)(B) as the only possible gateway left for Bowles, but that gate is closed too.  Although he argues that he is innocent of the death penalty, his intellectual disability claim "challenges only his eligibility for a death sentence, and not whether he is 'guilty of the underlying offense,' and thus does not fall within the narrow statutory exception in § 2244(b)(2)(B)(ii)."  In re Hill, 715 F.3d 284, 285 (11th Cir. 2013).  The concurring opinion takes issue with our precedent in Hill and encourages our Court to recognize an exception to § 2244(b) for claims asserting actual innocence of the death penalty.  But as we have explained, while the Supreme Court in Sawyer v. Whitley, 505 U.S. 333, 346–47 (1992), a pre-AEDPA case, recognized an actual innocence exception for state prisoners challenging their death sentences in successive § 2254 applications, AEDPA completely stripped federal district courts of jurisdiction to hear successive claims unless the prisoner first received authorization from the court of appeals.  That means that "post-AEDPA there is no . . . exception to the bar on second or successive habeas petitions for claims asserting 'actual innocence of the death penalty.'"  In re Hill, 715 F.3d at 301; see § 2244(b)(3)(A).

The concurring opinion also relies on Holland v. Florida to argue that barring an innocent-of-the-death-penalty claim would "undermin[e] basic habeas corpus principles," 560 U.S. 631, 648 (2010), but Holland is not on point.  It recognized that the one-year statute of limitations for filing original habeas

19

petitions was not jurisdictional and could be equitably tolled.  But it did not recognize an equitable exception for the limits on filing <u>successive</u> petitions set out in § 2244(b).  See Holland, 560 U.S. at 645–49.  Nor has Congress created an unnamed third exception to the two gateways for filing successive habeas petitions that are set out in § 2244(b)(2).  To the extent that Bowles is foreclosed from seeking habeas relief in the lower federal courts, he still "may petition the Supreme Court directly for a writ of habeas corpus under that Court's original jurisdiction." In re Hill, 715 F.3d at 301 n.20.

Finally, Bowles has also not pointed to a "factual predicate for the claim [that] could not have been discovered previously through the exercise of due diligence."  § 2244(b)(2)(B)(i).  If, as he claims, he is an intellectually disabled person, then that factual predicate has existed for long enough that he could have brought his Atkins claims in his first habeas petition.  But that he did not do.

### III. CONCLUSION

Finally, we have not overlooked our concurring colleague's belief that our decision, which she concedes faithfully applies the law as it exists, is "tragic[]" and not "a just one."  Concurring Op. at 27, 37.  Bowles was convicted of brutally bashing and strangling to death three men after convincing each of them to let him live with them.  See Bowles, 2019 WL 3886503, at *1–3.  Their only offense

20

apparently was their sexual orientation.  He hated gay men.[4]  It has been 23 years since he was convicted of murder in the first degree and 18 years since he was resentenced to death.  Under the law, his sentence is now due to be carried out. We do not feel compelled to join our colleague's criticism that what is tragic and unjust in this case is the application of the law to it.

Because Bowles has failed to make a prima facie showing that his claim satisfies the requirements of § 2244(b)(2), we **DENY** his application for leave to file a second or successive habeas petition.  Having denied the application, we also **DENY** Bowles' motion for a stay.  See In re Hill, 437 F.3d at 1083–84.

---

[4]  Bowles pleaded guilty to the murder of all three of the victims.  At his first sentencing trial for the murder of Walter Hinton the State's primary theory of the case was he killed Hinton "because Hinton was a homosexual and hated homosexuals."  Bowles, 716 So. 2d at 771. Although the Florida Supreme Court did not question the overwhelming evidence that Bowles hated gay men, see id. at 771–73, it vacated the death sentence because there was insufficient evidence linking that motive to the murder.  At the resentencing trial, the jury unanimously recommended a death sentence, the judge imposed it, and the Florida Supreme Court affirmed. See Bowles, 804 So. 2d at 1175, 1184.

MARTIN, Circuit Judge, concurring:

In Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), the Supreme Court "held that the Constitution 'restricts the State's power to take the life of' any intellectually disabled individual." Moore v. Texas, 581 U.S. __, 137 S. Ct. 1039, 1048 (2017) (alterations adopted) (quoting Atkins, 536 U.S. at 321, 122 S. Ct. at 2252). But that categorical bar is not so categorical in this Circuit. No court has considered the merits of Gary Bowles's claim that he is intellectually disabled and thus exempt from the death penalty. Yet the State of Florida is set to execute him today.

I wish it were not so, but this Court's precedent constrains me to deny Mr. Bowles's application for leave to file a successive habeas petition and his request for a stay of his execution. I write separately to describe the hurdles Mr. Bowles faced at the state and federal level in his efforts to have a court review the merits of his claim of intellectual disability. For me, the hurdles Mr. Bowles has faced present unacceptable (perhaps unconstitutional) barriers to vindicating the right articulated in Atkins.

## I.

Mr. Bowles was convicted of first-degree murder in 1996. After a series of proceedings in Florida state court, he was sentenced to death in 1999. On direct appeal, the Florida Supreme Court affirmed his sentence. See Bowles v. State, 804

22

So. 2d 1173, 1184 (Fla. 2001) (per curiam).  The United States Supreme Court

denied certiorari on June 17, 2002.  Bowles v. Florida, 536 U.S. 930, 122 S. Ct.

2603 (2002).  Three days later, the Supreme Court issued Atkins, which declared

for the first time that the execution of intellectually disabled prisoners violates the

Eighth Amendment's ban on cruel and unusual punishments.  536 U.S. at 321, 122

S. Ct. at 2252.

After Atkins, there was reason to believe Mr. Bowles's execution may be

barred by this new constitutional rule.  Although Mr. Bowles had not specifically

been evaluated for intellectual disability before his sentencing, a clinical

psychologist did test him using a then-current, full-scale intelligence assessment

called the Wechsler Adult Intelligence Scale Revised (WAIS-R).  Mr. Bowles got

an IQ score of 80 on the WAIS-R.  Accounting for errors in the methodology of

the WAIS-R[1] and the standard error of measurement involved in all IQ testing,

doctors gave affidavits saying this score may indicate Mr. Bowles's IQ is as low as

appropriately 70.  The Supreme Court observed in Atkins that an IQ of around or

below 70 may reveal potential intellectual disability.  See 536 U.S. at 309 n.5, 122

S. Ct. at 2245 n.5 ("[B]etween 1 and 3 percent of the population has an IQ between

70 and 75 or lower, which is typically considered the cutoff IQ score" for

---

[1]  According to doctors' affidavits, the WAIS-R was not properly normed and thus overstates IQ in certain populations.

intellectual disability).  Thus, given Mr. Bowles's score on the WAIS-R and other indicators, he may well be among those whose executions are barred by Atkins.

Typically, a state prisoner in Mr. Bowles's position could raise his Atkins claim in a state postconviction motion.  In the wake of Atkins, Florida gave offenders like Mr. Bowles, whose cases were in postconviction litigation, 60 days from October 1, 2004—the date Florida Rule of Criminal Procedure 3.203 was promulgated—to assert an Atkins claim.  See Amendments to Fla. R. of Crim. P. & Fla. R. of Appellate P., 875 So. 2d 563, 570 (Fla. 2004).  But we know from Florida's handling of those claims during the twelve years after Atkins was decided, it would have been utterly fruitless for Mr. Bowles to bring his Atkins claim in the Florida courts.

The Atkins Court left to the States the job of "developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."  Id. at 317, 122 S. Ct. at 2250 (alteration adopted and quotation marks omitted).  And with this discretion, Florida courts established that the State ban on executing the intellectually disabled, Fla. Stat. § 921.137, covered only those with "an IQ of 70 or below."  Zack v. State, 911 So. 2d 1190, 1201 (Fla. 2005) (per curiam); see also id. (citing Cherry v. State, 781 So. 2d 1040, 1041 (Fla. 2000) (per curiam) (accepting expert testimony that an offender must score 70 or below to qualify as "[mentally] retarded")).  Litigants repeatedly tested this hard cutoff in Florida's

24

courts, saying it undermined Atkins's mandate.  See, e.g., Cherry v. State, 959 So. 2d 702, 712–14 (Fla. 2007) (per curiam), abrogated by Hall v. Florida, 572 U.S. 701, 134 S. Ct. 1986 (2014).  But the Florida Supreme Court affirmed time and again that "a Florida defendant with an IQ score above 70 could not be deemed intellectually disabled and, therefore, was barred from presenting evidence regarding the other two prongs of the test for intellectual disability: adaptive functioning deficits and manifestation before age 18."  Walls v. State, 213 So. 3d 340, 345 (Fla. 2016) (per curiam) (describing the state of the law in Florida after Atkins, but before Hall).  Under Florida's then-well-established criteria, Mr. Bowles knew his IQ score of 80 would disqualify him from relying on Atkins, no matter what other evidence he marshalled supporting a claim of intellectual disability.  It made sense, therefore, for Mr. Bowles to not pursue an Atkins claim in the time limits proscribed by Florida Rule of Criminal Procedure 3.203.

Then twelve years after Atkins issued, the U.S. Supreme Court gave Mr. Bowles renewed hope about the viability of his claim of intellectual disability.  In Hall v. Florida, the Supreme Court held that Fla. Stat. § 921.137, as interpreted by Florida's courts, was unconstitutional.  572 U.S. at 721, 134 S. Ct. at 2000.  Florida had, according to Hall, wrongly "take[n] an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence."  Id. at 712, 134 S. Ct. at 1995.  Also, Florida had

25

improperly "relie[d] on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." Id.  In setting this straight, the Supreme Court said "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 723, 134 S. Ct. at 2001 (emphasis added).  Surely, Hall would give Mr. Bowles a chance to press his claim that his execution might be unconstitutional.  Turns out, this was not to be.

On October 19, 2017, Mr. Bowles filed a successive motion for state postconviction relief, arguing he is intellectually disabled and that his execution would violate the Eighth Amendment in light of Atkins and Hall.  Around the same time, Mr. Bowles was tested using the WAIS-IV, the most widely used and current IQ assessment instrument available.  He received a full-scale IQ score of 74, which falls within the range for intellectual disability.  Also supporting Mr. Bowles's motion was evidence of significant deficits in adaptive functioning that had their onset during his developmental period.

Mr. Bowles's October 19, 2017 motion had been pending for 600 days when Florida's Governor signed his death warrant and scheduled his execution.  Only after Mr. Bowles's execution was scheduled did the Florida Supreme Court direct

Florida's lower courts to give him some indication whether he would be able to present his claim that his execution might be unconstitutional.

Tragically, in my view, the Florida courts refused to even consider the merits of Mr. Bowles's claim. Instead, the circuit court summarily denied Mr. Bowles's claim as time-barred, and the Florida Supreme Court affirmed this decision. See Bowles v. State, __ So. 3d __, 2019 WL 3789971, at *2–3 (Aug. 13, 2019). The Florida Supreme Court explained that Mr. Bowles could not present his potentially viable Atkins claim because he failed to present it within 60 days of Florida Rule of Criminal Procedure 3.203 being promulgated. Id. at *2 (citing Harvey v. State, 260 So. 3d 906, 907 (Fla. 2018); Rodriguez v. State, 250 So. 3d 616 (Fla. 2016)). This time restriction applies, the Court held, even though Mr. Bowles did not have a meritorious claim until (at the earliest) Hall held Florida's rigid IQ cutoff unconstitutional. See Bowles, 2019 WL 3789971, at *2–3. The Court also imposed the time limit even though it had ruled that Hall is retroactively applicable to Florida litigants. See Walls v. State, 213 So. 3d at 346–47; see also Harvey, 260 So. 3d at 907.

I believe Florida's time bar "creates an unacceptable risk that persons with intellectual disability will be executed." Hall, 572 U.S. at 704, 134 S. Ct. at 1990. For more than a decade after Atkins, Florida law denied every offender who scored above 70 on an IQ test any exploration of the merits of a claim of intellectual

27

disability.  It wasn't until Hall was decided that Mr. Bowles could get the benefit of Atkins's pronouncement.  Nevertheless, the Florida courts say Mr. Bowles's failure to press a claim that would have been deemed frivolous means he forever gave up any chance to present evidence of his potential intellectual disability.  This rule dilutes Atkins's constitutional mandate for Florida death row inmates.

Hall requires that "[p]ersons facing that most severe sanction [of the death penalty] must have a fair opportunity to show that the Constitution prohibits their execution."  Id. at 724, 134 S. Ct. at 2001 (emphasis added).  Although the Supreme Court acknowledged "the States play a critical role in advancing protections and providing the Court with information that contributes to an understanding of how intellectual disability should be measured and assessed," "Atkins did not give the States unfettered discretion to define the full scope of the constitutional protection."  Id. at 719, 134 S. Ct. at 1998.  Neither did Atkins afford States the liberty to construct procedural rules that gut the constitutional requirement.  See In re Hill, 715 F.3d 284, 304–05 (11th Cir. 2013) (Barkett, J., dissenting) (arguing no "procedural hurdle . . . can be constitutionally enforced when doing so will eviscerate the constitutionally-protected right that a juvenile, mentally retarded, or insane offender has not to be executed."); Hill v. Humphrey, 662 F.3d 1335, 1367–70 (11th Cir. 2011) (en banc) (Barkett, J., dissenting) (describing Supreme Court precedent establishing that "a State cannot create

28

procedures that effectively eviscerate a substantive constitutional right, but rather must provide procedures which are adequate to safeguard against infringement of the constitutionally protected right" (alteration adopted and quotation marks omitted)); cf. Chapman v. California, 386 U.S. 18, 21, 87 S. Ct. 824, 826 (1967) ("With faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights."). The Florida courts designed a rule that has denied Mr. Bowles any meaningful opportunity to have his claim considered on the merits. Because neither Mr. Bowles nor his counsel predicted a change in the law or anticipated that he would need to pursue a then-frivolous claim, the Florida courts say he must forgo the protections afforded to him by Atkins and Hall.

"[T]o impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being." Hall, 572 U.S. at 708, 134 S. Ct. at 1992. We cannot pretend to avoid this violation simply by failing to learn whether an offender is intellectually disabled. "The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects." Id. at 724, 134 S. Ct. at 2001. The Florida courts may have done exactly that. Mr. Bowles should have been permitted to

29

develop the record supporting his claim of intellectual disability. Now, we will never know whether his execution defies <u>Atkins</u>'s categorical mandate.

## II.

When the Florida courts refused all evaluation of the merits of Mr. Bowles's claim of intellectual disability, he next looked to the federal courts to consider his claim. Yet, because of the strictures of the Antiterrorism and Effective Death Penalty Act of 1996 (AEPDA) and precedent in this Circuit, he finds no audience for the merits of his claim here either.

Mr. Bowles seeks to file a successive federal habeas corpus petition under 28 U.S.C. § 2254. It is successive because he already filed one § 2254 petition raising claims that are not at issue here. This being the case, he must meet the requirements of 28 U.S.C. § 2244(b) before filing a second federal petition. Under AEPDA, this court may not grant authorization to file a successive habeas petition unless an applicant satisfies one of two narrow statutory exceptions in § 2244(b)(2):

> (A) [T]he applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable

30

factfinder would have found the applicant guilty of the underlying offense.

Under this Circuit's precedent, Mr. Bowles can meet neither exception.

Use of the first exception is foreclosed by In re Henry, 757 F.3d 1151 (11th Cir. 2014), which held that the Supreme Court did not make the new rule announced in Hall retroactive to cases on collateral review. Id. at 1159. I dissented from Henry's holding, explaining my view that "if Atkins is retroactively applicable to cases on collateral review—and that conclusion is beyond any debate—then the Supreme Court's decision in Hall must also apply retroactively, to the extent it merely represents an application or clarification of the Atkins decision." Id. at 1165 (Martin, J., dissenting). I continue to believe Henry was wrongly decided.

The Majority Opinion also says Mr. Bowles cannot make a prima facie showing under § 2244(b)(2)(A) based on his argument that his Atkins claim was "previously unavailable" until Hall issued. To make a prima facie showing, a petitioner need only make "a sufficient showing of possible merit to warrant a fuller exploration by the district court." In re Holladay, 331 F.3d 1169, 1173–74 (11th Cir. 2003) (quotation marks omitted). Absent the strictures of our precedent, I would hold that Mr. Bowles has made a prima facie showing under § 2244(b)(2)(A).

31

The Fifth Circuit recognized a prima facie case for an inmate who had been afforded a path to relief, yet that path offered no actual possibility of relief. See In re Cathey, 857 F.3d 221 (5th Cir. 2017) (per curiam). It found that a Texas petitioner "presented sufficiently 'cogent arguments' that Atkins was previously unavailable" because at the time he filed his first federal habeas petition he "believed his IQ score to be 77—outside of the range that was then understood to satisfy the subaverage intellectual functioning prong of an Atkins claim." Id. at 230. Like Florida, Texas courts then used a cutoff for IQ scores, so the petitioner "had no reason to believe his known score of 77 . . . would satisfy an Atkins claim." Id. The Fifth Circuit recognized the petitioner's claim was practically unavailable even if he technically could have asserted it. See id. at 232–34. The Court permitted him to file his successive habeas petition because he made a prima facie showing that Atkins was previously unavailable to him. Our Court has not recognized such an exception. However, we could have, and I would have done so here.

As for Mr. Bowles's reliance on the second exception, his argument is foreclosed by In re Hill. Hill is another decision of this Court I believe was wrongly decided. Hill established that the exception in § 2244(b)(2)(B) concerning newly discovered evidence "is a narrow exception for claims that call into question the accuracy of a guilty verdict" and not Atkins claims that go to a

32

prisoner's eligibility for the death penalty. Hill, 715 F.3d at 296–97 (alterations adopted and emphasis and quotation marks omitted). The Hill panel said that the exception for newly discovered evidence "does not authorize the filing of a successive application under § 2244(b)(2)(B) based on a sentencing claim even in death cases." Hill, 715 F.3d at 297. Hill also rejected the idea that equitable exceptions to the bar on successive petitions that existed before AEDPA survived the enactment of AEDPA. See id. at 299–301. I believe this Court should have recognized that we may authorize petitioners to file a successive application for federal habeas relief raising an innocent-of-the-death-penalty claim. Either § 2244(b)(2)(B) or equitable exceptions to AEDPA's filing limitations would, in my view, allow for consideration of these claims in death penalty cases.

Before AEDPA became law, the Supreme Court recognized that in a "narrow class of cases," "[f]ederal courts retain the authority to issue the writ of habeas corpus" despite a petitioner's procedural default and "despite a petitioner's failure to show cause for a procedural default." McCleskey v. Zant, 499 U.S. 467, 494, 111 S. Ct. 1454, 1470 (1991). "This rule, or fundamental miscarriage of justice exception, [wa]s grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." Herrera v. Collins, 506 U.S. 390, 404, 113 S. Ct. 853, 862 (1993)

33

(quotation marks omitted). To prove a miscarriage of justice, a petitioner had to make a "colorable showing" of actual innocence. Id.

In Sawyer v. Whitley, 505 U.S. 333, 112 S. Ct. 2514 (1992), the Supreme Court held that the "actual innocence" exception applied to claims asserting innocence of the facts required to show the petitioner's eligibility for the death penalty. Id. at 346–47, 112 S. Ct. at 2522–23. To bring a claim of actual innocence of the death penalty, a petitioner had to present evidence establishing "a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law for the imposition of the death penalty." Id. at 346, 112 S. Ct. at 2523 (quotation marks omitted).

Circuits have divided over whether Sawyer's actual innocence exception survived the passage of AEDPA. In Hill, a divided panel of this Court said the Sawyer exception did not survive. 715 F.3d at 299–300. The Hill panel reasoned that Congress could have, but did not, expressly codify the Sawyer exception in AEDPA. Id. at 300. For that reason, it said Congress did not intend the Sawyer exception to remain viable. See id. At least one other circuit has agreed. Hope v. United States, 108 F.3d 119, 119–20 (7th Cir. 1997). But this Court's holding in Hill contrasts with decisions of the Fourth, Sixth, and Ninth Circuits. See Prieto v. Zook, 791 F.3d 465, 469 (4th Cir. 2015); Frazier v. Jenkins, 770 F.3d 485, 497 (6th

34

Cir. 2014); Thompson v. Calderon, 151 F.3d 918, 924 (9th Cir. 1998) (en banc).  I

find the rulings of those circuits to express the better view.  Cf. In re Holsey, 589

F. App'x 462, 466 (11th Cir. 2014) (Martin, J.) (unpublished) (noting "compelling

arguments that Sawyer's 'innocence of the death penalty' exception should survive

§ 2244(b)'s restrictions").

In contrast to this Circuit, those courts recognized that the passage of

AEDPA did not mean Congress intended for courts to wholly abandon all

equitable habeas doctrines.  As the Supreme Court explained in Holland v. Florida,

560 U.S. 631, 130 S. Ct. 2549 (2010), "AEDPA seeks to eliminate delays in

federal habeas review" but it "seeks to do so without undermining basic habeas

corpus principles and while seeking to harmonize the new statue with prior law,"

including "equitable principles."  Id. at 648, 130 S. Ct. at 2562.  Although

"Congress codified new rules governing this previously judicially managed area of

law, it did so without losing sight of the fact that the writ of habeas corpus plays a

vital role in protecting constitutional rights."  Id. at 649, 130 S. Ct. at 2562

(quotation marks omitted).  The Supreme Court thus cautioned that "[t]he

importance of the Great Writ, the only writ explicitly protected by the Constitution,

Art. I, § 9, cl. 2, along with congressional efforts to harmonize the new statute with

prior law, counsels hesitancy before interpreting AEDPA's statutory silence as

indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open." Id.

This Court's decision in Hill did not heed Holland's warning. Instead, Hill relied almost exclusively on congressional silence to foreclose equitable claims. This is the very thing Holland told us not to do. Neither did the Hill panel seek to harmonize AEDPA's restrictions with existing equitable doctrines, as it was required to do. These errors produced what I view as an inherently flawed decision and an equally flawed conclusion that AEDPA eliminated the Sawyer exception.

The Majority Opinion is right when it notes that Holland did not expressly address the application of the Sawyer exception after the passage of AEDPA. I rely on it here not for that proposition, but for the idea that AEDPA did not wipe away the existing equitable doctrines related to the writ of habeas corpus.

I note, too, the Hill panel failed to appreciate that the language of § 2244(b)(2)(B) does not compel an interpretation as narrow as the one this Court assigned it. See Thompson, 151 F.3d at 924. As the Ninth Circuit explained, "the words 'underlying offense' [in § 2244(b)(2)(B)(ii)] encompass a charge of capital murder." Thompson, 151 F.3d at 924. "[T]he difference in the language between the Sawyer standard and . . . § 2244(b)(2)(B)(ii)" was not intended to obliterate the Sawyer exception. Thompson, 151 F.3d at 924. Instead, it "was to accommodate non-capital as well as capital habeas petitions." Id. Again, the Ninth Circuit offers

a more sound interpretation of § 2244(b)(2)(B).  It harmonizes AEDPA with preexisting equitable doctrines, as the Supreme Court instructed us to do.  See Holland, 560 U.S. at 649, 130 S. Ct. at 2562.It is this Court's flawed precedent that stands in the way of any merits review of Mr. Bowles's intellectual disability claim.  Cases like Mr. Bowles's demonstrate the need for the Supreme Court or this Court sitting en banc to revisit the decisions that deny Bowles and others like him any chance to have their constitutional claims reviewed.

### III.

The time bar imposed by the Florida courts and this Court's interpretation of the requirements of AEDPA mean that Florida will end Mr. Bowles's life without ever knowing whether his execution violates the Eighth Amendment.  I am bound by the law of this Circuit to concur in the denial of his application for leave to file a successive habeas petition.  But I do not consider this decision to be a just one.